Rebecca A. Patterson
Rebecca@sonosky.net
Lloyd B. Miller
Lloyd@sonosky.net
Sonosky, Chambers, Sachse,
Miller & Monkman, LLP
510 L Street, Suite 310
Anchorage, AK 99501
Telephone: (907) 258-6377
Facsimile: (907) 272-8332

*Counsel for Plaintiff Tanana Chiefs Conference*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| TANANA CHIEFS CONFERENCE,<br>122 1st Avenue<br>Fairbanks, AK 99701,<br><br>Plaintiff,<br><br>v.<br><br>XAVIER BECERRA,<br>Secretary, U.S. Department of Health<br>and Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201,<br><br>and<br><br>UNITED STATES OF AMERICA,<br><br>Defendants. | Case No. 3:24-cv-0177 |

## VERIFIED COMPLAINT

Plaintiff Tanana Chiefs Conference ("TCC"), by and through its attorneys Sonosky, Chambers, Sachse, Miller & Monkman, LLP, complains and alleges as follows:

## INTRODUCTION

1.     This action seeks damages for the failure of the Secretary of Health and Human Services ("Secretary"), through the Indian Health Service ("IHS"), to pay TCC certain "contract support costs" due under the Alaska Tribal Health Compact and TCC's associated funding agreement with IHS (collectively, the "contract") in Fiscal Year ("FY") 2016. TCC's rights arise under its contract and the statute under which the contract was awarded, the Indian Self-Determination and Education Assistance Act ("ISDA"), 25 U.S.C. §§ 5301–5423.

2.     This action follows several Supreme Court decisions finding the federal government's failure to pay full contract support costs to tribal contractors like TCC to be contrary to law and a breach of contract. *See Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 192–94 (2012) (Bureau of Indian Affairs contracts); *Arctic Slope Native Ass'n, Ltd. v. Sebelius*, 567 U.S. 930 (2012), *on remand* 501 Fed. App'x 957, 959 (Fed. Cir. 2012) (IHS contracts); *Cherokee Nation v. Leavitt*, 543 U.S. 631, 636–38 (2005) (consolidated cases) (IHS contracts).

3.     This action also follows the Supreme Court's recent decision in *Becerra v. San Carlos Apache Tribe*, 144 S. Ct. 1428 (2024), holding that IHS is required to pay full contract support costs to tribal contractors to support the portion of their ISDA health programs funded by third-party revenues. *Id.* at *1445.

4.      The claims covered by this Complaint assert that by failing to pay TCC's full contract support cost requirement, including the portion of those costs associated with the expenditure of third-party revenues, the Secretary breached his legal obligations to TCC. TCC seeks as damages the unpaid contract support cost funds that the Secretary should have paid in FY 2016.

## JURISDICTION

5.      This Court has jurisdiction over this action pursuant to 25 U.S.C. § 5331(a); 28 U.S.C. §§ 1331, 1362; and 41 U.S.C. §§ 7103–7107 of the Contract Disputes Act ("CDA").

## PARTIES

6.      TCC, also known as Dena' Nena' Henash or "Our Land Speaks," is a non-profit tribal health organization that serves Alaska Native and American Indian people in Interior Alaska.  TCC has 42 members, including 37 federally recognized tribes.  At all relevant times, TCC carried out the Alaska Tribal Health Compact and associated funding agreements with the Secretary pursuant to Title V of the ISDA, 25 U.S.C. §§ 5381–5399.

7.      Xavier Becerra is the Secretary of the U.S. Department of Health and Human Services ("DHHS").  Secretary Becerra exercises limited responsibilities delegated to him by Congress pursuant to the ISDA and other applicable law, including the authority to enter into contracts on behalf of the United States with Indian tribes and tribal organizations. Secretary Beccera has further delegated some of these responsibilities to officials of IHS, a constituent agency of DHHS.  Throughout this Complaint (and unless context commands otherwise), the terms "Secretary," "DHHS," and "IHS" are used interchangeably.

8.     The United States of America is responsible for payment of all contracts with the Federal government.  Pursuant to provisions of the CDA and the ISDA, the United States has waived its sovereign immunity from suit for breach of contract actions.

## FACTS AND GENERAL ALLEGATIONS

### A.     The Indian Self-Determination Act

9.     The purpose of the ISDA is to ensure "maximum Indian participation" in the provision of services to Indian communities. § 5302(a).[1] The Act seeks to achieve this purpose through the "establishment of a meaningful Indian self-determination policy" that provides for the transition of federal programs serving Indian Tribes and Indian people from IHS operation to tribal operation. § 5302(b).

10.     Under Title V of the ISDA, tribes and tribal organizations may enter into compacts with IHS to plan, conduct, and administer the healthcare programs that otherwise would be administered by the Secretary. §§ 5382, 5384.  IHS must also negotiate and enter into funding agreements with compacting tribes and tribal organizations. § 5385(a).

11.     The ISDA provides that tribes and tribal organizations that contract for the operation of federal programs shall be paid two types of funding from IHS.  § 5325(a). First, tribal contractors are entitled to be paid the Secretary's program funds.  § 5325(a)(1). Second, tribal contractors are entitled to be paid contract support costs.  § 5325(a)(2), (3). Both of these sums must be added in "full" to the contract award.  § 5325(g).

---

[1] All citations to the U.S. Code are to Title 25 unless otherwise noted.

Case 3:24-cv-00177-HRH   Document 1   Filed 08/12/24   Page 4 of 22

12.     The first referenced subsection, § 5325(a)(1), provides for payment to the tribal contractor of the direct program funding, also called the "Secretarial amount," representing "the amount the Secretary would have expended had the government itself [continued to] run the program." *Arctic Slope Native Ass'n, v. Sebelius*, 629 F.3d 1296, 1298–99 (Fed. Cir. 2010), *vacated on other grounds*, 567 U.S. 930 (2012); *see also San Carlos Apache Tribe*, 144 S. Ct. at 1437.

13.     The other referenced subsections, § 5325(a)(2) and (3), require IHS to pay contract support costs in addition to the "Secretarial amount." Contract support costs are mostly "administrative expenses," *Cherokee Nation*, 543 U.S. at 635, although they more precisely fall into one of two subcategories: (1) indirect administrative (or overhead) contract support costs "such as special auditing or other financial management costs," *id.* (citing § 5325(a)(3)(A)(ii)), and (2) direct contract support costs for certain annually recurring costs attributable directly to the personnel and facilities employed to carry out the contracted IHS programs, "such as workers' compensation insurance," *id.* (citing § 5325(a)(3)(A)(i)).

14.     The ISDA defines contract support costs with particularity:

The contract support costs that are eligible costs for the purposes of receiving funding under this chapter shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of—

(i) direct program expenses for the operation of the Federal program that is the subject of the contract, and

(ii) any additional administrative or other expense incurred by the governing body of the Indian Tribe or Tribal organization and any overhead expense incurred by the tribal contractor in connection with

the operation of the Federal program, function, service, or activity pursuant to the contract,

except that such funding shall not duplicate any funding provided under subsection (a)(1) of this section.[2]

§ 5325(a)(3)(A).

15.     Generally, indirect contract support costs are determined by a reference to a tribal contractor's "indirect cost rate." § 5304(g); *see also Cherokee Nation*, 543 U.S. at 635.  An indirect cost rate is a common accounting tool that recipients of federal funds employ to allocate administrative and overhead costs across multiple programs supported by pooled administrative activities.  *Rumsfeld v. United Techs. Corp.*, 315 F.3d 1361, 1363 (Fed. Cir. 2003).  Such pooled activities typically include financial management and accounting systems, information technology systems, insurance, facilities, procurement activities, and personnel management systems.

16.     Direct contract support costs are costs attributable directly to the personnel and facilities covered by the program funds that are not otherwise incorporated into a tribal contractor's indirect cost pool.  *Id.* (citing § 5325(a)(3)(A)(i)).  These costs include, but are not limited to, the amounts actually incurred by a contractor in carrying out a contract. According to IHS, these direct program expenses include insurance, training required to maintain certification of direct program personnel, other personnel costs such as workers compensation insurance, and "facility support costs to the extent not already made

---

[2] As amended by the 2020 PROGRESS for Indian Tribes Act, Pub. L. No. 116-180, § 204(1)(B), 134 Stat. 857, 880 (2020).

available." Indian Health Serv., U.S. Dep't of Health and Hum. Servs., Indian Health Manual § 6-3.2D(1) (2019).

17.    The ISDA specifies that a tribe's contract support cost requirement may not duplicate costs already paid to a tribe as part of the Secretarial amount. § 5325(a)(3)(A). In adding this provision, Congress specified that "[i]n the event the Secretarial amount . . . for a particular function proves to be insufficient in light of a contractor's needs for prudent management of the contract, contract support costs are to be available to supplement such sums." S. Rep. No. 103-374, at 9 (1994).

18.    Section 5321(g) of the ISDA mandates that § 5325 (along with every other provision of the Act and every provision of TCC's contract with IHS) must "be liberally construed for the benefit of the Indian Tribe participating in self-determination, and any ambiguity shall be resolved in favor of the Indian Tribe." The Supreme Court has interpreted this language to mean that the government "must demonstrate that its reading [of the ISDA] is clearly required by the statutory language." *Salazar*, 567 U.S. at 194 (quoting § 5329(c) (model agreement § 1(a)(2)) (citation updated)).

19.    The ISDA directs that "[u]pon the approval of a . . . contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under [§ 5325(a)], subject to adjustments for each subsequent year that such tribe . . . administers a Federal program, function, service, or activity under such contract." § 5325(g); *see also* § 5396(a) (providing that § 5325(a)–(k) "shall apply to compacts and funding agreements authorized by [Title V]").

20.     The ISDA permits, but does not require, that contract support costs be determined in a negotiation between the parties.  § 5325(a)(3)(C) (Tribes "shall have the option to negotiate with the Secretary the amount of funds that the tribe or tribal organization is entitled to receive under such contract pursuant to this paragraph.").  The Secretary's duty to add full contract support costs to a contract is not contingent upon such a negotiation.

21.     The ISDA delegates to the Secretary limited regulatory and discretionary authority, but this delegated rulemaking authority does not include authority to issue regulations concerning contract support costs.  *See Ramah Navajo Sch. Bd. v. Babbitt*, 87 F.3d 1338, 1344 (D.C. Cir. 1996) ("Congress has clearly expressed in the ISDA . . . its intent to circumscribe as tightly as possible the discretion of the Secretary," and "[t]he statute itself reveals that not only did Congress *not* intend to commit allocation decisions to agency discretion, it intended quite the opposite; Congress left the Secretary with as little discretion as feasible in the allocation of [contract support costs]." (citation omitted)).

22.     Title V provides, "[u]nless expressly agreed to by the participating Indian tribe in the compact or funding agreement, the participating Indian tribe shall not be subject to any agency circular, policy, manual, guidance, or rule adopted by the Indian Health Service, except for the eligibility provisions of section 5324(g) of this title and regulations promulgated under this section."  § 5397(e).  This provision was expressly incorporated into TCC's contract.  *See* Alaska Tribal Health Compact, art. II, § 9(a)–(b), Ex. A ("Compact"); *see also, e.g.*, Fiscal Year 2015–2017 Multi-Year Funding Agreement § 8.4, Ex. B ("FY 2015–2017 FA").  The Secretary's Title V regulations do not address contract

support cost issues, other than to note that the Secretary must provide contract support costs as specified in the ISDA. 42 C.F.R. §§ 137.79, 137.143. In sum, the ISDA provides for full recovery of all contract support costs incurred in carrying out the federal program that is the subject of a contract.

23. When IHS runs federal programs providing health care to Indian people, it uses both appropriated funds from Congress and funds collected from Medicare, Medicaid, and private insurers. *See* Dep't of Health & Hum. Servs., IHS, *Justification of Estimates for Appropriations Committees* CJ-6, CJ-149 (FY 2016) (available at https://www.ihs.gov/sites/budgetformulation/themes/responsive2017/documents/FY2016 CongressionalJustification.pdf); *see also San Carlos Apache Tribe*, 144 S. Ct. at 1441. That is, IHS bills Medicare, Medicaid, and private insurers, collects revenues from those sources, and then uses those revenues to operate larger federal programs serving Indian people. *See* § 1621e(a); 42 U.S.C. §§ 1395qq, 1396j, 1397ee(c)(6)(B); *see also* H.R. Rep. No. 94-1026(I), at 108 (1976) ("[T]he Committee firmly expects that funds from Medicare and Medicaid will be used to expand and improve current IHS health care services and not to substitute for present expenditures."). This revenue is generally called "third-party revenues," and the generation and expenditure of third-party revenues is an integral part of IHS operations.

24. Similarly, when tribal contractors such as TCC assume operation of federal programs pursuant to the ISDA, they also use both appropriated funds and third-party revenues to fund the program. Tribal contractors are required by the terms of their contracts and applicable federal law to bill and collect revenues from third-party payers such as

Medicare, Medicaid, and private insurers, *see e.g.*, § 1623(b), and to spend such third-party revenues "to further the general purposes of the contract," § 5325(m)(1). Just as in an IHS-operated program, these third-party revenues are a crucial part of a tribal contractor's ability to provide health care.

25.     Recognizing that these revenues are a crucial part of the federal program operated by a tribal contractor, the Supreme Court held in *Becerra v. San Carlos Apache Tribe* that tribal contractors are entitled to receive contract support costs associated with the expenditure of third-party revenues. 144 S. Ct. at 1445. As the Court explained in that case:

> Because a self-determination contract requires a tribe to spend program income to further the programs transferred to it in the contract, [§ 5325(a)(2) and (a)(3)] require IHS to pay contract support costs when a tribe does so, just as IHS must pay contract support costs to support a tribe's spending of the Secretarial amount.

*Id.* at 1440; *see also* § 1623(b) (mandating that health care programs operated by Indian tribes and tribal organizations, as with programs operated directly by IHS, must be "the payer of last resort" for the services they provide).

### B.     The Contract Documents

26.     During FY 2016, TCC operated various federal health care programs, functions, services, and activities pursuant to the contract. TCC provides a wide variety of crucial health care services to Alaska Natives, American Indians, and other eligible individuals living in Interior Alaska. These services include primary medical care,

pharmacy services, dental services, pediatric care, obstetrics, optometry services, behavioral health services, orthopedic services, and other specialty services.[3] TCC operates the Chief Andrew Isaac Health Center in Fairbanks and also operates smaller health care clinics in many of its member villages.

27. The programs described in paragraph 26 of this Complaint were operated pursuant to the Alaska Tribal Health Compact (the "Compact") with IHS.[4] The Compact is the basic contract document at issue in this case. The terms of the Compact are required by and inextricably intertwined with the ISDA. The Compact states that it "shall be liberally construed to achieve its purposes." Compact, art. I, § 2. Similarly, Title V of the ISDA, which governs the Compact, provides that "[e]ach provision of [Title V] and each provision of a compact or funding agreement shall be liberally construed for the benefit of the Indian tribe participating in self-governance and any ambiguity shall be resolved in favor of the Indian tribe." § 5392(f).

28. The Compact was written "to carry out a Self-Governance Program authorized by Title V, and is intended to transfer to tribal governments, at a tribe's request, the power to decide how federal programs, services, functions and activities (or portions thereof) shall be funded and carried out." Compact, art. I, § 2(a). It was also meant to

---

[3] Services, TCC, https://www.tananachiefs.org/services/ (last visited July 23, 2024); *see also* FY 2015–2017 FA, § 3 (listing out the programs, functions, services, and activities that TCC performs under its contract with IHS).

[4] The Alaska Tribal Health Compact has been frequently amended and restated since the first version went into effect on October 1, 1994. Relevant to the claims presented here is the FY 2011 version that went into effect on October 1, 2010, and all citations in this Complaint are to that version.

"promote[] the autonomy of the Tribes in Alaska in the realm of health care." *Id.* Consistent with this purpose, the Compact relies heavily on the provisions of the ISDA.

29.     The core purpose of the Compact between IHS and TCC is:

[T]o enable [TCC] to re-design health programs, activities, functions, and services of the Indian Health Service; to reallocate funds for programs, activities, functions, or services according to the priorities of [TCC]; to enhance the effectiveness and long-term financial stability of [TCC]; and to streamline the federal Indian Health Service bureaucracy.

*Id.* art. I, § 2(b).

30.     The contract documents also include TCC's funding agreements with IHS, which describe, among other things, the program TCC will operate. Funding agreements can cover single or multiyear periods and may be amended throughout the year to take account of appropriations changes and new funds that are made available. *See* 25 U.S.C. § 5385(e) ("[E]ach funding agreement shall remain in full force and effect until a subsequent funding agreement is executed."). In FY 2016, TCC operated pursuant to its FY 2015–2017 multi-year funding agreement for its Title V funds. This funding agreement was incorporated in its entirety into the Compact. *See* Compact, art. II, § 2(c).

31.     The contract documents that are controlling for the claims asserted here are the Alaska Tribal Health Compact, the FY 2016 funding agreement, modifications to those documents, and the various other statutory and administrative provisions incorporated by law into such contract documents, including the ISDA.

## C.    Claim History

32.    In FY 2016, the Secretary failed to pay the full amount of TCC's contract support cost requirement.  IHS only paid TCC for those contract support costs associated with the portion of TCC's healthcare program that was funded with IHS-appropriated dollars.  IHS excluded from this amount the portion of TCC's program spending that was funded with third-party revenues that TCC collected and spent pursuant to its contract with IHS.  Additionally, IHS underpaid TCC for the indirect contract support costs associated with the portion of the federal program funded with appropriated dollars in FY 2016.

33.    This failure to pay full contract support costs on the entire federal program, including that portion funded by third-party revenues, led to an underpayment of $5,920,921 in FY 2016.

34.    The third-party revenues used to support the program under contract were earned by TCC through its billing and collecting from third-party payers, such as Medicare, Medicaid, and private insurance, when it provided health care under the federal program. During FY 2016, revenues from Medicare, Medicaid, and private insurance made up over 75% of TCC's third-party revenues.

35.    TCC is required by law to seek outside payment for services where available, as (just like IHS) tribal contractors are the "payer of last resort" and may only use appropriated funds once all applicable third-party payers have been billed.  § 1623(b).

36.    TCC then spent the third-party revenues it had collected on the contracted federal program, as required by law, including by providing additional health care services

to beneficiaries. § 5325(m)(1). TCC's annual costs to operate the federal program exceed the amount it receives from IHS, and so it is necessary for TCC to use its third-party revenues to maintain the same level of services that would otherwise be provided by the Secretary.

37. On September 29, 2022, TCC filed a timely claim for reimbursement of its unpaid contract support costs incurred in FY 2016. Ex. C.

38. TCC's claim letter asserted a sum certain of "$5,920,932," plus interest. Of this total claimed amount, $2,504,396 was for indirect contract support costs associated with the portion of TCC's healthcare program funded by third-party revenues, and the remaining $3,416,525 was for the indirect contract support costs associated with the portion of TCC's healthcare program funded by appropriated dollars.

39. The claim letter asserted that the Secretary's duty to pay contract support costs includes costs to support the portions of a tribal organization's contracted programs funded with third-party revenues received from Medicare, Medicaid, and private insurers and spent to carry out an ISDA contract "consistent with the decision issued in *Navajo Health Foundation—Sage Memorial Hospital, Inc. v. Burwell*, Case No. 1:14-cv-00958 (D.N.M. Nov. 3, 2016)." *Id.* at 2; *see also Navajo Health Found.—Sage Mem'l Hosp., Inc. v. Burwell*, 263 F. Supp. 3d 1083 (D.N.M. 2016), *appeal dismissed*, No. 18-2043, 2018 WL 4520349 (10th Cir. July 11, 2018). The Supreme Court has since confirmed that IHS is required to pay contract support costs to support the portion of the federal program funded by third-party revenues. *San Carlos Apache Tribe*, 144 S. Ct. at 1445.

40. TCC properly accounted for other sources of funding and other programs in calculating the direct cost base, properly allocated its indirect costs across all awards, and properly calculated the total indirect contract support costs due.

41. On August 28, 2023, the Secretary, acting through the IHS Deputy Director, denied TCC's FY 2016 claim. Ex. D.

42. IHS denied that the Secretary was required by contract and by law to reimburse TCC's indirect costs associated with the expenditure of third-party revenues spent to carry out the federal program under contract. *Id.*

43. IHS also provided two other reasons for rejecting TCC's claim: (1) according to IHS, TCC should have but failed to provide sufficient documentation of the specific sources of the revenue used for the additional expenditures being claimed and failed to show that this revenue was collected in connection with the contract, and (2) IHS's appropriation for FY 2016 had since been cancelled, and therefore IHS no longer had any funds available to pay the claim. *Id.*

## COUNT I

### (BREACH OF CONTRACT FOR UNDERPAYMENT OF INDIRECT CONTRACT SUPPORT COSTS IN FISCAL YEAR 2016 ASSOCIATED WITH THE ENTIRE FEDERAL PROGRAM UNDER CONTRACT, INCLUDING THE PORTION OF THE FEDERAL PROGRAM SUPPORTED WITH THIRD-PARTY REVENUES)

44. TCC incorporates all previous allegations of fact and law into this Count I.

45. When TCC took over operation of IHS's federal program, controlling law required TCC to continue to collect and spend third-party revenues, just as IHS had done prior to TCC's assumption of the federal program. §§ 1621e(a), 1621f(a)(1),

1641(c)(1)(B), 1641(d), 5325(m); 42 U.S.C. §§ 1395qq, 1396j, 1397ee(c)(6)(B). The billing, collection, and expenditure of third-party revenues to carry out the contract is expressly contemplated by the parties' contract. Compact, art. III, § 7; *see also, e.g.*, FY 2015–2017 FA § 3.1.13 (noting TCC's performance of billing functions).

46.     TCC was entitled to receive contract support costs to support the IHS federal program TCC operated in FY 2016, regardless of the extent to which that federal program was funded by appropriated dollars or third-party revenue dollars.

47.     IHS failed to calculate and pay to TCC the administrative costs incurred when spending third-party revenues on the program, even though generating those revenues and spending them on health care was expressly contemplated by the Compact and was an integral and essential part of the federal program described in the Compact, *see* Compact, art. III, § 7, and even though the expenditure of those revenues pursuant to the contract caused TCC to incur substantial administrative costs. IHS's failure to pay TCC the indirect contract support costs associated with TCC's third-party revenue-supported health care operations—that is, the failure to include these third-party revenues in the IHS direct program base against which TCC's indirect cost rates were applied—resulted in significant under-reimbursements to TCC of indirect contract support costs. It was also contrary to law.

48.     As a result of IHS's breach of contract, TCC was required to divert resources to cover the indirect costs associated with the expenditure of the third-party revenues. The diverted funds were thus no longer available for other crucial health care purposes under the contract, including expanded behavioral health and wellness services, dedicated

behavioral health services for children and youth, services to respond to polysubstance use, and elder care services and support.

49.     Neither of IHS's other arguments provides a lawful basis to deny TCC's claim.

50.     TCC properly presented all parts of its claim to IHS, including providing IHS with adequate information to understand the basis for TCC's entitlement to the relief requested. *See Cont. Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987) ("We know of no requirement in the [CDA] that a 'claim' must be submitted in any particular form or use any particular wording. All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim."). TCC's claim included both a sum certain and an explanation of how that sum was calculated. This was sufficient to state a claim under the CDA.

51.     TCC properly accounted for other sources of funding and other programs in calculating the direct cost base, properly allocated its indirect costs across all awards, and properly calculated the total indirect contract support costs due.

52.     The fact that IHS's FYs 2016 appropriation may have been cancelled and is therefore unavailable to use to pay TCC's claim at this time does not mean that TCC's claim was lawfully denied. In the event of a judicial decision sustaining TCC's breach of contract claims in this matter, the federal Judgment Fund must be used to pay TCC the resulting judgment. 31 U.S.C. § 1304; *see also* U.S. General Accounting Office, Principles of Federal Appropriations Law, 14-31, 45 (3d ed. 2008), https://www.gao.gov/assets/2019-

11/203470.pdf; *Salazar*, 567 U.S. at 198 ("Congress expressly provided in ISDA that tribal contractors were entitled to sue for 'money damages' under the Contract Disputes Act upon the Government's failure to pay, 25 U.S.C. §§ [5331](a), (d), and judgments against the Government under that Act are payable from the Judgment Fund, 41 U.S.C. § 7108(a)."); *cf. Cherokee Nation*, 543 U.S. at 642 (explaining that a contractor is "free to pursue appropriate legal remedies arising because the Government broke its contractual promise" when an agency's appropriated funds are otherwise committed).

53.    General contract principles control the calculation of damages in government contract litigation.    This is so because "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals."  *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934)); *see also Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607–08 (2000) (quoting *Winstar* and relying on the RESTATEMENT (SECOND) OF CONTRACTS (1981) ("RESTATEMENT")); *Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002) (quoting *Mobil Oil*, 530 U.S. at 607, and applying principles of general contract law).

54.    General contract law on the issue of damages is clear that a contractor is entitled to damages which will protect "his 'expectation interest,' which is his interest in having the benefit of his bargain *by being put in as good a position as he would have been in had the contract been performed* . . . ."  RESTATEMENT § 344(a) (emphasis added).

55.    TCC incurred no less than $2,504,396 in indirect costs associated with the expenditure of third-party revenue that was generated and spent pursuant to the IHS

Case 3:24-cv-00177-HRH   Document 1   Filed 08/12/24   Page 18 of 22

contract. The Secretary admits that IHS did not pay any indirect contract support costs associated with these expenditures. In failing to pay TCC this amount, the Secretary breached his contract with TCC.

56.     TCC incurred an additional $3,416,525 in indirect costs associated with the expenditure of appropriated program funds beyond the amount provided by the Secretary in FY 2016. In failing to pay TCC this amount, the Secretary breached his contract with TCC.

## COUNT II

**(BREACH OF STATUTORY RIGHT FOR UNDERPAYMENT OF INDIRECT CONTRACT SUPPORT COSTS IN FISCAL YEAR 2016 ASSOCIATED WITH THE ENTIRE FEDERAL PROGRAM UNDER CONTRACT, INCLUDING THE PORTION OF THE FEDERAL PROGRAM SUPPORTED WITH THIRD-PARTY REVENUES)**

57.     TCC incorporates all previous allegations of fact and law into this Count II.

58.     The ISDA creates a right of action for money damages to remedy the Secretary's breach of his obligations under the ISDA. § 5331.

59.     Under § 5325(a)(2)–(3), the Secretary in FY 2016 had a statutory duty to reimburse TCC's full indirect contract support costs, including those costs associated with spending third-party revenues in support of the contract. *See San Carlos Apache Tribe*, 144 S. Ct. at 1445.

60.     The Secretary failed to pay TCC $5,920,921 in indirect contract support costs due in FY 2016.

61.     Due to the Secretary's breach of his statutory obligations, TCC was required to divert resources to cover the unpaid indirect contract support costs associated with the

expenditure of the third-party revenues and appropriated dollars. These funds were thus no longer available for other crucial health care purposes under the contract.

62. In order to remedy the Secretary's breach of his statutory obligations, TCC is entitled to damages of no less than $5,920,921, plus applicable interest and attorneys' fees and costs, all as specifically prayed below.

## RELIEF REQUESTED

WHEREFORE, the Tanana Chiefs Conference prays that this Court grant the following relief:

A. A declaratory judgment that the Secretary acted in violation of the ISDA and in breach of his contracts with TCC by failing to pay TCC the full amount of contract support costs that TCC incurred under its contracts with the Secretary in FY 2016;

B. A money judgment for $5,920,921, the amount due TCC as a result of the Secretary's actions described in paragraph A, including consequential and other allowable damages for underpayment of contract support costs;

C. Interest for one year from the payment due date for the payment the Secretary failed to make under the contract, as provided for under the Prompt Payment Act, 31 U.S.C. §§ 3901–3907;

D. Interest under the Contract Disputes Act, 41 U.S.C. §§ 7101–7109, from the date the claim was filed until the date of payment upon entry of final judgment;

E. Costs and attorneys' fees incurred in pursuing this claim, including the appeal before this Court, as provided for under the Equal Access to Justice Act, 5 U.S.C. § 504; 28 U.S.C. § 2412; 25 U.S.C. § 5331(c); and other applicable law; and

F.     Such other monetary, declaratory, and equitable relief as this Court may find to be just.

Respectfully submitted this 9th day of August, 2024.

SONOSKY, CHAMBERS, SACHSE
MILLER & MONKMAN, LLP

By: */s/ Rebecca A. Patterson*
Rebecca A. Patterson
AK Bar No. 1305028
Rebecca@sonosky.net
Lloyd B. Miller
AK Bar No. 7906040
Lloyd@sonosky.net

Attorneys for Plaintiff Tanana Chiefs
Conference

## VERIFICATION

Brian Ridley says:

I am the Chief and Chairman of Plaintiff Tanana Chiefs Conference, and I make this verification by authority for and on its behalf. I have read the foregoing Complaint, know the contents thereof, and from information officially furnished to me believe the same to be true.

I verify under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated: 8/8/24

Brian Ridley
Chief and Chairman, TCC